IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

CECIL JOHNSON, JR.,

    Plaintiff,

v.                                                                                  No. 04-2140 B

BUD DAVIS CADILLAC, INC.,

    Defendant.

_____

MEMORANDUM OPINION AND ORDER
_____

INTRODUCTION

The pro se Plaintiff, Cecil Johnson, Jr., a black male formerly employed by the Defendant, Bud Davis Cadillac, Inc. ("Cadillac"),[1] brings this lawsuit pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., alleging discrimination on the basis of race and retaliation. A bench trial was conducted on August 15, 2005. For the reasons set forth in this opinion, the Court finds that Cadillac did not discriminate or retaliate against the Plaintiff. Accordingly, judgment is entered in favor of the Defendant.

FINDINGS OF FACT

1.      Johnson is a black male resident of Memphis, Tennessee and was at the time the relevant incidents occurred employed as a used lot porter by the Defendant, a family-owned car dealership with multiple locations in Memphis, Tennessee.

2.      His position as a used car porter was comprised of cleaning cars and washing and

---

[1] By agreement of the parties, the proper name of the Defendant employer of the Plaintiff was Bud Davis Cadillac, Inc. and thus its name is substituted herein for the former Defendant, Cadillac of Memphis.

straightening the lot. He worked in the used car building, which also housed the used car salesmen. Employees connected with the sale of new cars, including those involved in sales, financing and "get-ready," occupied a separate building nearby. Porters in the used and new car departments performed roughly similar duties.

   3. On October 9, 2003, Johnson was in the used car facility with Steve Hegwood, a black used car manager, when Gary Blaylock, a family member of the owner and a manager, called Hegwood to request that a porter come to the new car building. It is the Plaintiff's position in this case that he was asked for specifically, but Blaylock denied requesting any porter in particular. In any case, Johnson walked to the new car building through a downpour. When he arrived, Blaylock wanted him to take care of a new car, which upset the Plaintiff because his job was in the used car department. It was Johnson's impression that he was sent out into the rain so that white workers, who he insisted were present in the new car department at the time, could remain dry. Blaylock testified that, prior to calling Hegwood, he and Steve Natale, another manager, had paged the new car porters but had received no response. He denied seeing the two white new car porters Johnson claimed were standing inside the new car building. It was Blaylock's testimony that the Plaintiff was belligerent and asked why they were f---ing with him.

   4. The following day, Johnson asked Blaylock if he "had anything against him" based on the incident the night before. Afterward, he was called into Blaylock's office to discuss the issue. At that time he was told by Natale, who was also present, that he was to obey instructions from management no matter who it was or what he was asked to do.

   5. On the evening of November 21, 2003, Chris Blaylock, a manager and a relative of Gary Blaylock, informed Johnson during a meeting also attended by Hegwood that he was to be at

work by 8:00 a.m. the next day, a Saturday, in order to rearrange cars on the lot in anticipation of a large-volume sales day. According to the Plaintiff, another used lot porter was also at the meeting.

  6. After Johnson arrived at work the next morning he was instructed by Aulandus Shipp, a used car salesman, to clean and gas up a car sold the night before that was to be delivered that day.

  7. While he was cleaning the car, the Plaintiff received a telephone call from Chris Blaylock asking why he was not assisting Hegwood move the cars as instructed the previous evening. The Plaintiff avers that during the call Blaylock screamed and cursed at him. By the time Johnson joined Hegwood on the used car lot, Hegwood had completed the task almost by himself, moving all but two of some 60 vehicles.

  8. Upon his arrival at the lot about 9:45 a.m., Blaylock met with Johnson and Hegwood concerning the Plaintiff's failure to assist in moving the cars. Johnson responded, in what Blaylock considered an intimidating fashion, that he had done everything he was told to do and asked if there was anything management had ever requested of him that he had not done. According to Blaylock, Johnson waved his arms, spoke in a raised voice and acted in a belligerent manner.

  9. The Plaintiff was sent home and, after conferring with Hegwood, the decision was made to fire him for insubordination and refusal to follow instructions.

CONCLUSIONS OF LAW

At the outset, it is necessary for the Court to clarify what is and is not properly before it in this matter. During the trial, the Plaintiff attempted to present evidence of a violation of Title VII based on an alleged failure to promote, involving the hiring of a white employee to the position of new car get-ready manager, a position to which Johnson wished to apply. However, a review of the complaint reveals that this claim was not submitted to the Equal Employment Opportunity

Commission (the "EEOC").  "[I]t is well settled that federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can be reasonably expected to grow out of the EEOC charge."  Hopson v. DaimlerChrysler Corp., 157 F.App'x 813, 817 (6th Cir. 2005).  In the present case, Johnson included in the EEOC charge only those claims for race discrimination and retaliation.  Moreover, he has not provided the court with any reason to conclude that the failure to promote claim could be reasonably expected to grow out of the EEOC charge.  Accordingly, to the extent a claim of discrimination based on a failure to promote has been raised, it is hereby DISMISSED.

The Plaintiff also referred at trial to an alleged disability arising from a hip replacement.  To the extent he has attempted to include a claim under the Americans with Disabilities Act in this action, it is DISMISSED based on his failure to bring the claim before the EEOC prior to filing suit in this Court.  At this point, the Court turns its attention to Johnson's race discrimination and retaliation claims.

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race . . ."  42 U.S.C. § 2000e-2(a)(1).  Disparate treatment as posited by the Plaintiff "occurs when an employer treats some employees less favorably than others because of race, religion, sex, or the like."  Huguley v. Gen. Motors Corp., 52 F.3d 1364, 1370 (6th Cir. 1995).  A plaintiff may prevail by presenting direct evidence of discrimination or by presenting circumstantial evidence, utilizing the evidentiary framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), from which a factfinder could draw an inference of

4

discriminatory motive. See Seay v. Tenn. Valley Auth., 339 F.3d 454, 463 (6th Cir. 2003).

With respect to direct evidence, the Sixth Circuit has explained as follows:

> Where a plaintiff presents direct evidence of discriminatory intent in connection with a challenged employment action, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination. This court has explained that direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.

Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003), reh'g and suggestion for reh'g en banc denied (Apr. 22, 2003) (internal citations and quotation marks omitted).  Thus, upon a showing by a plaintiff of credible direct evidence of discriminatory animus, the employer must "do more than merely 'articulate' its nondiscriminatory reason for its action."  Brack v. Shoney's, Inc., 249 F.Supp.2d 938, 947 (W.D. Tenn. 2003), reconsideration denied, No. 01-CV-2997-DV, 2003 WL 23924996 (W.D. Tenn. Mar. 27, 2003).

Where direct evidence is not available, as is the case here, a plaintiff may, utilizing the McDonnell Douglas/Burdine analysis, create an inference of discrimination based on introduction of evidence supporting a prima facie case of discrimination based on race, that is:  "(1) he was a member of a protected class"; (2) he suffered an adverse employment action; . . ." (3) "he was qualified for the position from which he was discharged" and (4) that he "was either replaced by someone outside the protected class or treated differently than similarly situated, non protected employees."  Noble v. Brinker Int'l, Inc., 391 F.3d 715, 728 (6th Cir. 2004), cert. denied, ___ U.S. ___, 126 S.Ct. 353, 163 L.Ed.2d 62 (2005).  Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason

5

for its actions. McDonnell Douglas Corp., 411 U.S. at 802, 93 S.Ct. at 1824. If the employer carries its burden of production, the presumption raised by the plaintiff's prima facie case is rebutted. A plaintiff must then prove, by a preponderance of the evidence, that the employer's stated reasons for the employment action were a pretext for discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 518-19, 113 S.Ct. 2742, 2753-54, 125 L.Ed.2d 407 (1993).

The first and third elements of the prima facie case are not at issue here, as it is undisputed Johnson is a member of a protected class and the Defendant has not argued he was unqualified for the position he held. With respect to the second element of the prima facie case, the Plaintiff has alleged he was discriminated against when he was sent out into the rain in order to perform the duties of white new car porters.

An adverse employment action under the second element must be a *materially* adverse change in the terms or conditions of plaintiff's employment caused by the employer's actions. Bowman v. Shawnee State Univ., 220 F.3d 456, 461-62 (6th Cir. 2000). Thus, in order to be actionable, the adverse action must be sufficiently severe. See Halloran v. Minn. Old Ne. Agents Ltd. P'ship, 58 F.Supp.2d 831, 841 (W.D. Tenn. 1999).

> A materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

Bowman, 220 F.3d at 461-62. De minimis actions are not materially adverse and are not actionable. Id. at 462. In Kocsis v. Multi-Care Management, Inc., 97 F.3d 876 (6th Cir. 1996), the Sixth Circuit, in discussing this issue, noted that reassignment, a requirement that an employee sign an agreement with the employer as a condition of promotion, a negative public perception concerning a transfer

or a particular job, a transfer to a position with different responsibilities, semantic changes in title, and the bruising of an ego did not, without more, rise to the level of "materially adverse changes" in the terms of employment.  Kocsis, 97 F.3d at 885-87.  Courts in this Circuit have also found that a reprimand or an involuntary transfer, absent loss of pay or benefits, or change in duties, does not constitute a materially adverse change in employment.  See Akers v. Alvey, 338 F.3d 491, 498 (6th Cir. 2003); Reid v. Madison County, Tenn., No. 98-5312, 1999 WL 196560, at *2 (6th Cir. Apr. 1, 1999); Halloran, 58 F.Supp.2d at 841.  "An employee's subjective impressions as to the desirability of one position over another are not relevant."  Policastro v. Nw. Airlines, Inc., 297 F.3d 535, 539 (6th Cir. 2002), reh'g and suggestion for reh'g en banc denied (Oct. 2, 2002).  Thus, being sent out into the rain in order to walk to a separate building on the Defendant's property to retrieve a vehicle falls hopelessly short of being an actionable adverse employment action.

While he was later fired, which of course is considered an adverse employment action, the Plaintiff has completely failed to demonstrate that his *discharge* was racially motivated or that white employees who were insubordinate or failed to obey the instructions of management were treated any differently.

However, even if the Court were to conclude that Johnson had presented a prima facie case of discrimination, the Defendant has produced a legitimate, nondiscriminatory reason for his termination.  According to Hegwood, Johnson was a good worker at times and at other times could not be found, depending on his shifting moods.  Chris Blaylock testified that at the time of Johnson's discharge the dealership was short-handed and he needed someone in the porter position who was diligent in performing his duties.  It was his opinion that Johnson was not such a person.

The Plaintiff has failed to show, as he must, that Cadillac's proffered reasons were pretextual.

7

In making the requisite showing, he "must introduce admissible evidence to show 'that the proffered reason was not the true reason for the employment decision' and that racial animus was the true motivation driving the employer's determination." Barnes v. United Parcel Serv., 366 F.Supp.2d 612, 616 (W.D. Tenn. 2005) (citing Hicks, 509 U.S. at 508, 113 S.Ct. 2742).  Pretext may be shown by evidence that the defendant's stated reason had no basis in fact, did not actually motivate the decision or was not sufficient to motivate the employer's action. See Manzer v. Diamond Shamrock Chem. Co. 29 F.3d 1078, 1084 (6th Cir. 1994), reh'g and suggestion for reh'g en banc denied (Sept. 22, 1994).  "[E]stablishing that the employer's reason was a pretext requires that a plaintiff do more than simply impugn the legitimacy of the asserted justification; in addition, the plaintiff must also adduce evidence of the employer's discriminatory animus." Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 804 (6th Cir. 1994).  As the Supreme Court observed in Hicks,

> Title VII does not award damages against employers who cannot prove a nondiscriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of . . . race.  That the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of race is correct.

Hicks, 509 U.S. at 523-24, 113 S.Ct. at 2756.  That is, "it is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." Reeves v. Sanderson Plumbing Prods, Inc., 530 U.S. 133, 147, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000) (citing Hicks, 509 U.S. at 519, 113 S.Ct. 2742) (emphasis in original).

The basis for the Plaintiff's claims concerning the rain incident is that he was required to do something that was not in his official job description.  It is clear Johnson's official position was in the used car department, but everyone who testified at trial, all of whom were called by the Plaintiff, stated that they would perform any duties requested by management, regardless of whether it

8

required them to work with new or used cars. Moreover, Hegwood, who is black, himself testified that he had sent several used car lot porters to work in the new car get-ready building and that new car porters assisted used car porters.

Specifically, witness James Gordon, Jr., who was employed in the new car get-ready department, testified that if he had been instructed by any of the dealership's owners or managers to go from the new car department to the used car lot in order to prepare a used car he would do so even though it was not part of his official job description. Another of Johnson's witnesses, Jimmy Smith, related that, while he worked in the service department, he would step in and help the lot porters if they got behind and that, at one point, he was instructed to drive a car from one location to another across town and was told when he arrived that he was to report to work at that location the next day. He ended up working there for the next eight months. When he was employed as a used car porter, Smith was also asked by Chris Blaylock and others to perform porter duties with new cars and was soon doing both at once. He articulated that, as a used car porter, he would have performed the duties of a new car porter if asked by management to do so without question.

Clearly, the Defendant ran a somewhat liquid operation, with employees and managers being moved about as needs required. The testimony also revealed that employees were fired and rehired with some frequency. No evidence, however, has been presented to suggest that such practices were discriminatory on the basis of race. The fact that they may have been unfair and disconcerting to or unpopular with the affected employees does not make them discriminatory.

With respect to his retaliation claims, the Plaintiff maintains that "he was retaliated against when Chris Blaylock cursed and terminated [his] for asking a question." In order to establish retaliation, the plaintiff must demonstrate that "(1) [he] engaged in protected activity; (2) the

9

exercise of [his] civil rights was known by the defendant; (3) the defendant thereafter took adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action."  Hibbler v. Reg'l Med. Ctr. at Memphis, 12 F.App'x 336, 340 (6th Cir. 2001) (citing Walborn v. Erie County Care Facility, 150 F.3d 584, 588-89 (6th Cir.1998)).  "If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the adverse employment action.  The plaintiff, of course, bears the ultimate burden of proving that the proffered reason for the action was merely a pretext for discrimination."  Penny v. United Parcel Serv., 128 F.3d 408, 417 (6th Cir. 1997).

"Protected activity" under the first prong of the prima facie case has been defined as "opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII."  Ackel v. Nat'l Commc'ns, Inc., 339 F.3d 376, 385 (5th Cir. 2003), reh'g and reh'g en banc denied (Sept. 30, 2003) (citation omitted).  Thus, "protected activity" does not include *any* opposition to *any* practice, but, rather, encompasses practices involving alleged unlawful *discriminatory* conduct.  Johnson v. Univ. of Cincinnati, 215 F.3d 561, 579-82 (6th Cir.), cert. denied, 531 U.S. 1052, 121 S.Ct. 657, 148 L.Ed.2d 560 (2000).  In this case, the Plaintiff has offered no proof that his questioning of Chris Blaylock had anything to do with alleged discriminatory practices.  Instead, Johnson was taking issue with an opinion of management as to his job performance, not his race, with which he strongly disagreed.  As he has failed to show he engaged in protected activity, the Plaintiff's retaliation claim cannot prevail.

Johnson also contends in his pretrial memoranda that he was retaliated against when Gary Davis, apparently an owner of the dealership, "mislead" him "for eleven days thinking that he would

10

get his job back." According to the Plaintiff, he complained to Davis about the termination. Johnson asserted that Davis agreed to talk with him and told him he could return to work. A few days later, Davis allegedly called him to say that he could not in fact return, as the managers who had fired him adamantly did not want him back. Once again and for the reasons previously set forth herein, Johnson has failed to establish the existence of protected activity.

At bottom, the essence of the Plaintiff's claim is that he was mistreated by members of Cadillac's management and that he subjectively blamed that mistreatment on his race. Any subjective opinion on the Plaintiff's part that his superiors did not like black people is simply insufficient to prevail on a Title VII claim. "[A] plaintiff's personal beliefs, conjecture and speculation as to the defendant's motivation," even if truly believed by the plaintiff, do not constitute competent evidence." Marthel v. Bridgestone/Firestone, Inc., 926 F.Supp. 1293, 1300 (M.D. Tenn. 1996); see also Giles v. Norman Noble, Inc., 88 F.App'x 890, 895 (6th Cir. 2004) ("subjective beliefs regarding racial bias" on the part of the defendant insufficient to establish pretext).

"The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." See Woodbury v. Sears, Roebuck & Co., 901 F.Supp. 1560, 1565 (M.D. Fla. 1995) (citation omitted). As a district court in this Circuit has reflected,

> Tennessee is an employment-at-will state. . . . Consequently, the Court's role is not to determine whether an employer's decision to fire an employee was wise, right or otherwise. An employee may allege he has been subjected to a great deal of mistreatment by a supervisor. This Court does not condone such behavior; yet, even assuming the allegations of poor treatment by one's employer are true, a court has no role in curing those wrongs unless the employer's actions violate the law.

Anderson v. Mead Johnson Nutritional Group, Bristol-Myers Squibb Co., 910 F.Supp. 376, 380 (E.D. Tenn. 1996), aff'd, 107 F.3d 870 (6th Cir. 1997). Stated differently, while firing him over what could

11

have been merely a misunderstanding concerning what he was supposed to do and when was undoubtedly unfortunate from Johnson's standpoint, unless his managers at Cadillac discriminated against him *because he was black*, they did not violate Title VII.  Discharging him because they thought he failed to follow instructions, disapproved of his attitude, considered him a difficult employee, or just did not like him in general is not actionable.  At worst, this case involves race-neutral animosity between the Plaintiff and his superiors.  See Knox v. Neaton Auto Prods. Mfg., Inc., 375 F.3d 451, 457-58 (6th Cir. 2004) (protected class-neutral animosity between plaintiff and supervisor not sufficient to support a Title VII claim).

IT IS SO ORDERED this 24th day of March, 2006.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE